79 F.3d 896
 26 Envtl. L. Rep. 20,829, 96 Cal. Daily Op.
Serv. 1808,
96 Daily Journal D.A.R. 3134
 WESTERN RADIO SERVICES COMPANY, INC., Oregon corporation,
Plaintiff-Appellant,
v.
Michael ESPY, Secretary, U.S. Department of Agriculture;
Jack Ward Thomas, Chief, U.S. Forest Service; John Lowe,
Regional Forester; Richard A. Ferraro, Deputy Regional
Forester; Tom Schmidt, Forest Supervisor; Byron Cheney,
District Ranger; Slater Communications & Electronics, Inc.,
Defendants-Appellees.
 No. 94-35605.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Oct. 17, 1995.
Decided March 18, 1996.
 
 Michael D. Axline, Johnson & Kloos, Eugene, Oregon, for plaintiff-appellant.
 Joan M. Pepin, United States Department of Justice, Washington, D.C., for federal defendants-appellees.
 Rose M.Z. Freeby, Evans, Freeby & Jennings, Salem, Oregon, for defendant-appellee Slater Communications.
 Appeal from the United States District Court for the District of Oregon; Malcolm F. Marsh, District Judge, Presiding.
 Before: WALLACE, D.W. NELSON, and BRUNETTI, Circuit Judges.
 WALLACE, Circuit Judge:
 
 
 1
 Western Radio Services Co., Inc. (Western) appeals from the district court's summary judgments for the United States Forest Service (Service) and Slater Communications & Electronics, Inc. (Slater). The district court held that the Service did not abuse its discretion in issuing a special use permit to Slater and that Western did not have standing to bring a claim under the National Environmental Policy Act (NEPA). The district court had jurisdiction under 5 U.S.C. § 702 and 28 U.S.C. § 1331. We have jurisdiction over this timely appeal pursuant to 28 U.S.C. § 1291. We affirm.
 
 
 2
 * The Gray Butte Electronics Site is located on the Crooked River National Grassland in the Ochoco National Forest in Oregon. The Service and the Department of Agriculture manage the site and have authority to issue special use permits for land under their control; however, permits for uses coming within Federal Communications Commission (Commission) jurisdiction are contingent upon Commission authorization and licensing. Pursuant to special use permits issued by the Service, Slater and Western operate and maintain mobile radio communications facilities at Gray Butte. Slater and Western originally received permits in 1976 and 1978, respectively.
 
 
 3
 On December 10, 1986, the Service issued a special use permit to Slater to construct, maintain, and rent a new building and tower on Gray Butte. Western appealed from the Service's decision to issue a permit, complaining that the new building would exacerbate interference problems at the site and that the permit did not conform to the applicable site plan. Eventually, Western settled with the Service and the Service agreed to update the Gray Butte Site Plan. In 1989, the Service adopted a new site plan and in 1990, it issued Slater a new building permit. The 1989 Site Plan permits only "compatible uses of the site" and requires any equipment or tower that causes interference to be adjusted or removed. Again, Western complained of potential interference and appealed from the Service's reissuance of a permit to Slater. The Forest Supervisor denied the appeal.
 
 
 4
 On appeal from the Forest Supervisor's denial, the Regional Forester refused to reverse the Service's decision to issue a permit. However, the Regional Forester directed the Service either to document its efforts to resolve Western's complaints about current or potential interference or to hold meetings with site users to address potential incompatibility problems. The Service conducted several meetings with users, and the Regional Forester determined that the Service had complied with the earlier decision. Approximately two months after the Regional Forester's approval, Gray Butte site users agreed on an acceptable location for Slater's new facility. Richard Oberdorfer, Western's president, disputes that he ever agreed to this location. The Forest Supervisor issued a Decision Notice and a finding of no significant impact, stating its intention to issue Slater a special use permit to construct a building and tower at the agreed-upon site. Western again appealed to the Regional Forester, who affirmed the decision to issue a special use permit. On May 17, 1993, the Chief of the Forest Service declined discretionary review. The Chief's determination constituted final agency action.
 
 
 5
 Western then filed this action in the district court, alleging that the Service's decision to issue Slater a building permit violated NEPA. Western also asserted that the decision violated the National Forest Management Act, 16 U.S.C. § 497, because the Service allegedly failed to comply with applicable regulations. Western argued that applicable regulations included the Forest Service Manual (Manual) and Forest Service Handbook (Handbook), in addition to the regulations promulgated under 16 U.S.C. § 497 and codified at 36 C.F.R. §§ 251.50 et seq. (1995). The district court rejected Western's claims.
 
 II
 
 6
 Slater suggests we not address the merits of the appeal. Slater argues that the district court lacked jurisdiction over Western's claims because Western did not exhaust administrative remedies. Slater asserts that Western should have complained to the Commission before filing in the district court.
 
 
 7
 It is within our discretion to require exhaustion, Montes v. Thornburgh, 919 F.2d 531, 537 (9th Cir.1990), and we will generally require that a plaintiff exhaust all administrative remedies before assuming jurisdiction. White v. Jacobs Eng'ring Group Long Term Disability Benefit Plan, 896 F.2d 344, 352 (9th Cir.1989). Here, the district court properly retained jurisdiction. Western's complaint states a claim against the Service for issuing a special use permit to Slater. It was the Service, and not the Commission, that issued the use permit. Although the Commission deals with problems of interference, the Commission does not have the authority to redress Western's complaints about the issuance of the permit. Nor can the Commission redress Western's complaints about the location of Slater's new facility. We will not require Western to complain to the Commission about a Service permit before bringing an action in the district court.III
 
 
 8
 We therefore turn to the merits of the appeal. We review a summary judgment de novo. First Pacific Bank v. Gilleran, 40 F.3d 1023, 1024 (9th Cir.1994), cert. denied, --- U.S. ----, 116 S.Ct. 55, 133 L.Ed.2d 19 (1995). This review requires us to determine (1) whether there is a genuine issue of material fact when the evidence is viewed in the light most favorable to the nonmoving party, and (2) whether the district court correctly applied the law. Id.
 
 
 9
 When reviewing an administrative agency's decision, we view the case from the same position as the district court. Nevada Land Action Ass'n v. United States Forest Service, 8 F.3d 713, 716 (9th Cir.1993) (Nevada Land Action ). An agency's decision should be overturned if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A); Idaho Farm Bureau Fed'n v. Babbitt, 58 F.3d 1392, 1401 (9th Cir.1995). Review under the arbitrary and capricious standard is narrow and the reviewing court may not substitute its judgment for that of the agency. Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 376, 109 S.Ct. 1851, 1860, 104 L.Ed.2d 377 (1989) (Marsh ). We must determine whether the agency's decision was made after considering the relevant factors and whether the agency made a clear error of judgment. Id. at 378, 109 S.Ct. at 1861. We may reverse the agency's decision as arbitrary or capricious only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, offered an explanation that ran counter to the evidence before the agency, or offered one that is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. Dioxin/Organochlorine Center v. Clarke, 57 F.3d 1517, 1521 (9th Cir.1995).
 
 
 10
 The Service issues special use permits subject to regulations promulgated by the Secretary of the Department of Agriculture (Secretary). See 16 U.S.C. § 497. Generally, the Service's decision to issue or deny a permit is subject to judicial review. See KOLA, Inc. v. United States, 882 F.2d 361, 364 (9th Cir.1989) (KOLA ). However, we will review an agency's alleged noncompliance with an agency pronouncement only if that pronouncement actually has the force and effect of law. United States v. Fifty-Three (53) Eclectus Parrots, 685 F.2d 1131, 1136 (9th Cir.1982) (Fifty-Three Parrots ). We will not review allegations of noncompliance with an agency statement that is not binding on the agency.
 
 
 11
 Western contends that the Service acted arbitrarily and capriciously by issuing a permit and following a procedure that failed to comply with the Service's regulations, 36 C.F.R. §§ 251.52, 251.54 (1995), and the Service's guidelines in its Manual and Handbook.
 
 
 12
 The National Forest Management Act authorizes the Secretary to issue regulations "for the purpose of constructing or maintaining buildings, structures, and facilities for industrial or commercial purposes whenever such use is related to or consistent with other uses on the national forests." 16 U.S.C. § 497(c). In 1980, the Service adopted regulations setting forth standards to consider in issuing special use permits. 36 C.F.R. § 251.54 (1995). These regulations have the force and effect of law. KOLA, 882 F.2d at 364.
 
 
 13
 Section 251.54(i) contains various factors that the Service may consider when denying a permit. Section 251.54(i)(1) provides that a Service official may deny issuance of a special use permit if the proposed use "would be inconsistent or incompatible" with other existing forest uses. Also, section 251.52 states: "Special use authorizations ... shall be in such form and contain such terms, stipulations, conditions, and agreements as may be required by the regulations of the Secretary and the instructions of the Chief."
 
 
 14
 In addition to these regulations, the Office of the Chief, pursuant to 36 C.F.R. § 200.4 (1995), issued the Manual and Handbook. Western argues that the Service violated various provisions of the Manual and Handbook. It argues that the Manual and Handbook have the independent force and effect of law and that the Service therefore acted arbitrarily and capriciously in failing to follow them. Western alternatively argues that even if the Manual and Handbook do not have the independent effect of law, sections 251.52 and 251.54 adopt the Manual and Handbook by reference, thereby rendering them binding. If we hold that the provisions in the Manual and Handbook do not have the force and effect of law either independently or by reference, we will not need to review Western's contention that the Service failed to comply with the guidelines contained in either. We therefore turn to the first issue.
 
 A.
 
 15
 To determine whether the Manual and the Handbook have the independent force and effect of law:
 
 
 16
 the agency pronouncement must (1) prescribe substantive rules--not interpretive rules, general statements of policy or rules of agency organization, procedure or practice--and, (2) conform to certain procedural requirements. To satisfy the first requirement the rule must be legislative in nature, affecting individual rights and obligations; to satisfy the second, it must have been promulgated pursuant to a specific statutory grant of authority and in conformance with the procedural requirements imposed by Congress.
 
 
 17
 Fifty-Three Parrots, 685 F.2d at 1136 (internal quotations and citations omitted); see also Chrysler Corp. v. Brown, 441 U.S. 281, 301, 99 S.Ct. 1705, 1717, 60 L.Ed.2d 208 (1979) (Chrysler ).
 
 
 18
 Neither the Manual nor the Handbook satisfies either of the requirements in Fifty-Three Parrots. First, the Manual and Handbook are not substantive in nature. In United States v. Doremus, 888 F.2d 630, 633 n. 3 (9th Cir.1989), cert. denied, 498 U.S. 1046, 111 S.Ct. 751, 752, 112 L.Ed.2d 772 (1991), we explained in dictum that "the Forest Service Manual merely establishes guidelines for the exercise of the Service's prosecutorial discretion; it does not act as a binding limitation on the Service's authority." See also Stone Forest Industries v. United States, 973 F.2d 1548, 1551 (Fed.Cir.1992) (Manual does not have force and effect of law); Lumber, Prod. and Indus. Workers Log Scalers Local 2058 v. United States, 580 F.Supp. 279, 283 (D.Or.1984) (Manual is "basically a large compilation of guidelines ... [and] not a 'substantive' rule" (internal quotations and citations omitted)). The Manual and Handbook are a series of "[p]rocedures for the conduct of Forest Service activities." 36 C.F.R. § 200.4(b), (c)(1) (1995).
 
 
 19
 The Manual and Handbook are not promulgated in accordance with the procedural requirements of the Administrative Procedure Act. Neither is published in the Federal Register or the Code of Federal Regulations. See Parker v. United States, 448 F.2d 793, 797 (10th Cir.1971), cert. denied, 405 U.S. 989, 92 S.Ct. 1252, 1255, 31 L.Ed.2d 455 (1972). They are not subjected to notice and comment rulemaking; they are not regulations. Hi-Ridge Lumber Co. v. United States, 443 F.2d 452, 455 (9th Cir.1971) (Manual "does not rise to the status of a regulation").
 
 
 20
 Nor are the Manual and Handbook promulgated pursuant to an independent congressional authority. The National Forest Management Act authorizes the Secretary to promulgate regulations, but the Manual and the Handbook are not regulations from the Secretary. 36 C.F.R. § 200.4(d)(1) (1995) (Chief of Forest Service promulgates rules in Manual and Handbook). The Manual and Handbook provisions are contemplated in a Service regulation, not in a congressional statute.
 
 
 21
 We hold that the Manual and Handbook do not have the independent force and effect of law.
 
 B.
 
 22
 Western also argues that even if the Manual and Handbook do not have the independent force and effect of law, sections 251.52 and 251.54(i)(1) incorporate by reference the Manual and Handbook and therefore bind the Service to the procedural guidelines contained therein. Western argues that section 251.52, which requires special use permits to comply with "the instructions of the Chief," effectively binds the Service to the provisions in the Manual and Handbook. Western also argues that section 251.54(i)(1), which states that an officer "may deny issuance" of a permit if the permit would be incompatible with existing uses, requires the Service to look to the Manual and Handbook for compatibility guidelines.
 
 
 23
 Neither of these arguments has merit. Both the Supreme Court in Chrysler, 441 U.S. at 301, 99 S.Ct. at 1717, and our court in Fifty-Three Parrots, 685 F.2d at 1136, explicitly require agency rules to be substantive and to be promulgated according to certain procedural requirements before they can bind an agency. Even assuming that the Manual and Handbook are somehow incorporated into the Secretary's regulations (although they are not mentioned in either section 251.54(i)(1) or 251.52), the Secretary cannot bind the Service to a Manual or Handbook that is neither promulgated pursuant to congressional procedures nor contemplated in a statute. Mere incorporation does not convert a procedural guideline into a substantive regulation. We therefore have no authority to bind the Service to the guidelines in the Manual or the Handbook. Even if we did have that authority, there is nothing in the record to support Western's complaints that the Service violated the provisions in the Manual or the Handbook.
 
 C.
 
 24
 Because we hold that neither the Manual nor the Handbook has the force and effect of law, we review the Service's issuance of a permit only under its binding regulations. After eliminating the claims based on the Manual and Handbook, Western seems to argue that the Service failed to follow 36 C.F.R. § 251.54(i)(1) and therefore acted arbitrarily and capriciously.
 
 
 25
 Section 251.54(i)(1) specifies that the Service may consider whether a special use permit would be compatible with existing uses. Although the provision is discretionary, we hold that the Service did make a compatibility assessment and that its decision to issue Slater a building permit was not arbitrary or capricious. The permit authorizes Slater to construct a new facility and raze its old one. The permit does not authorize any new uses that could cause interference. To the extent that merely moving sites or changing equipment will create new interference problems, the permit provides that if Slater's "installation of [new] radio equipment or tower causes interference, [Slater] will be required to make adjustments to solve the interference problem, or remove the problem causing equipment. If interference problems cannot be resolved, authorization for the use will be terminated and equipment removed from the site." The Site Plan therefore considered the issue of compatibility even though the record contains no documented evidence of incompatibility. In fact, Oberdorfer, Western's president, technician, and general manager, admitted that a properly constructed new facility might actually reduce "considerably" potential interference. Overall, the record indicates that the Service did consider compatibility of uses and did not abuse its discretion in issuing a permit to Slater.
 
 IV
 
 26
 Western argues that the district court erred in holding that it did not have standing to assert a claim under NEPA. We review the issue of standing de novo. Nevada Land Action, 8 F.3d at 715.
 
 
 27
 In Lujan v. Defenders of Wildlife, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), the Supreme Court delineated the three minimum constitutional requirements to have standing to challenge an alleged injury. First, the plaintiff must allege an actual or imminent invasion of a concrete and legally-protected interest. Second, there must be a causal connection between the injury and the alleged harmful conduct. Third, it must be likely that a favorable decision will redress the injury. Id. at 560-61, 112 S.Ct. at 2136-37.
 
 
 28
 Because NEPA suits are reviewed under the Administrative Procedure Act, Marsh, 490 U.S. at 375-76, 109 S.Ct. at 1860-61, a plaintiff alleging a NEPA claim must also "assert an interest arguably within the zone of interests to be protected or regulated" by NEPA. Nevada Land Action, 8 F.3d at 715-16 (citation and internal quotation omitted). NEPA's purpose is "to protect the environment, not the economic interests of those adversely affected by agency decisions. Therefore a plaintiff who asserts purely economic injuries does not have standing to challenge an agency action under NEPA." Id. at 716 (citations omitted and emphasis added); Port of Astoria v. Hodel, 595 F.2d 467, 475 (9th Cir.1979) (Hodel ) (where alleged injuries "represent only pecuniary losses and frustrated financial expectations that are not coupled with environmental considerations," injuries are outside NEPA's zone of interests).
 
 
 29
 Despite our more recent decision in Nevada Land Action to the contrary, Western points to language in Hodel that suggests that a plaintiff who suffers purely economic injury may still have standing. In Hodel, several plaintiffs alleged that the construction of an aluminum reduction plant would severely impact the environment. Another plaintiff, Hermiston Broadcasting Company, complained only that power transmission lines to be built to service the plant would interfere with Hermiston's broadcasts. Hodel held that the primary impact of the plant was environmental, and that Hermiston had standing because its purely economic injuries were "causally related to an act that lies within NEPA's embrace." Hodel, 595 F.2d at 476.
 
 
 30
 Although this narrow holding in Hodel may cause tension with the broader and more recent holding in Nevada Land Action, we need not pursue the matter. Western's only complaint is that the Service's permit will cause economically harmful interference. No one alleges that Slater's new facility "will have a primary impact on the natural environment." Id. On appeal, Western now attempts to characterize the alleged interference as an "environmental impact," yet Oberdorfer admitted that Western's sole complaint was alleged interference, which we have held is purely economic. See id. (allegations that new transmission lines would cause broadcast interference "may be classified as economic"). Western's injury is therefore not one that NEPA aims to redress.
 
 V
 
 31
 Slater asks that we exercise our discretion and impose sanctions against Western and its counsel. Fed. R.App. P. 38; 28 U.S.C. §§ 1912, 1927. Although we have little tolerance for plaintiffs who use our court solely has a means of harassment or competitive gain, we do not believe that Western's appeal is frivolous. Therefore, we decline to impose sanctions in this case at this time.
 
 
 32
 AFFIRMED.