**CITY OF LOS ANGELES, Southern California Edison Company, Plaintiffs,**

**v.**

**U.S. DEPT. OF AGRICULTURE, U.S. Forest Service, Pacific Pipeline Systems, Inc., et al. Defendants.**

**No. CV 96–6423 ABC (CWx).**

United States District Court, C.D. California.

Dec. 23, 1996.

---

Christopher G. Caldwell, Michael R. Leslie, David Pettit, Hedges & Caldwell, Los Angeles, CA, for Plaintiffs.

James L. Meeder, Daniel J. O'Hanlon, Kimberly McMorrow, Beveridge & Diamond, San Francisco, CA, for Pacific Pipeline System.

John Rubiner, Kurt Zimmerman, U.S. Attorneys, U.S. Justice Department, Los Angeles, CA, for Federal Defendants.

**Defendants' Motion for Summary Judgment on the Issue of Plaintiff Edison's Standing**

COLLINS, District Judge.

Defendants' motion for summary judgment on the issue of Plaintiff Southern California

Edison Company's standing came on regularly for hearing before this Court on December 23, 1996. After reviewing the materials submitted by the parties, argument of counsel, and the case file, it is hereby ORDERED that the motion is GRANTED.

## I. Introduction

This case arises from a dispute between the parties concerning the government's environmental approval of one of two competing crude oil pipeline proposals. The unsuccessful parties, Southern California Edison Company and the City of Los Angeles, are Plaintiffs in this action. The successful party, Pacific Pipeline Systems, Inc., along with the various federal agencies and officers involved in the selection process, are the Defendants.

## II. Procedural Background

On September 13, 1996, Plaintiffs CITY OF LOS ANGELES ("City") and SOUTHERN CALIFORNIA EDISON COMPANY ("Edison") filed a Complaint for declaratory and injunctive relief for alleged violations of the National Environmental Policy Act ("NEPA") by Defendants UNITED STATES DEPARTMENT OF AGRICULTURE and a named officer thereof; UNITED STATES FOREST SERVICE ("Forest Service") and named officers thereof (collectively "Federal Defendants"); and PACIFIC PIPELINE SYSTEMS, INC. ("PPSI").

In the Complaint, Plaintiffs challenge the adequacy of a March 7, 1996 Final Environmental Impact Statement ("EIS") which the Federal Defendants prepared for a proposed crude oil pipeline. Plaintiffs seek to enjoin the Federal Defendants and Defendant PPSI, the company building the approved pipeline, from taking any action to build the pipeline until this court has determined that a legally adequate EIS has been prepared, circulated for public review, and approved in conformance with NEPA. On October 29, 1996, PPSI filed its Answer to Plaintiffs' Complaint.

On November 8, 1996, PPSI filed the instant motion for summary judgment against Edison based on lack of standing and failure to exhaust administrative remedies. On November 25, 1996, the Federal Defendants filed a separate motion for summary judgment against Edison, alleging Edison's lack of standing. On December 2, 1996, Edison filed an Opposition brief, addressing the arguments of both PPSI and the Federal Defendants. On December 9, 1996, PPSI and the Federal Defendants filed their Reply briefs.

## III. Factual Background

### A. The Original PPSI Project

In 1991, Defendant PPSI proposed to construct and operate a 171-mile crude oil pipeline in Southern California, originating in the Gaviota Marine Terminal in Santa Barbara County, then extending eastward to Santa Clarita, then south through San Fernando, Glendale, Los Angeles County, and terminating at refineries located in Wilmington and El Segundo. ("original PPSI Project").

In October 1991, PPSI submitted to the California Public Utilities Commission ("CPUC") an application for recognition as a common carrier public utility and for authority to incur indebtedness as a public utility. In connection with its review and ultimate approval of PPSI's 1991 application, the CPUC also served as the lead agency responsible for preparing a comprehensive environmental review of the original PPSI Project and various alternative projects pursuant to the California Environmental Quality Act ("CEQA"), Cal.Pub.Res.Code § 21000 et seq.

In April 1993, the CPUC issued a draft Environmental Impact Report ("EIR") for the 1991 original PPSI Project. The 1991 original PPSI Project crossed 54 Edison electrical power transmission rights-of-way and passed near eight Edison electrical substations located in Los Angeles County. Despite the proximity of the original PPSI project to Edison's property, Edison did not participate in any public meeting, submit any comments on, or raise any objection to the 1991 original PPSI Project during the public comment period on the 1993 draft EIR.

The final EIR for the 1991 original PPSI Project was issued in September 1993. This EIR, and the CPUC decision certifying it, determined that the 1991 original PPSI Project was the environmentally superior alternative to the "no project" alternative (i.e.,

continued use of existing modes of transportation of crude oil), other transportation modes, other routing alternatives, and other competing pipelines, including an alternative pipeline proposed by the Cajon Pipeline Company ("Cajon"). The CPUC also found that the final EIR met all CEQA requirements.

## B. The Reconfigured PPSI Project

In December 1993, PPSI filed an amended application with the CPUC. In this amended application to the CPUC, PPSI sought authorization to transport additional oil produced in the San Joaquin Valley, in addition to the already approved transport of offshore and coastal area crude oil ("reconfigured PPSI Project"). To transport San Joaquin Valley crude oil, a change in the pipeline route north of Castaic Junction was required. The route of the 1993 reconfigured PPSI Project from Castaic Junction south followed the same route as the 1991 original PPSI Project.

PPSI was required to obtain a Forest Service permit to construct, operate and maintain the portion of the reconfigured PPSI Project that ran through the Angeles National Forest. The Forest Service and the CPUC entered into a memorandum of understanding to prepare a joint Environmental Impact Statement/Subsequent Environmental Impact Report ("EIS/SEIR") for the 1993 reconfigured PPSI project. On June 10, 1994, the CPUC issued a Notice of Preparation of the EIS/SEIR. The Forest Service published its Notice of Intent to prepare the EIS/SEIR on June 16, 1994. Edison did not participate in or submit any comments during the NEPA/CEQA scoping process on the Draft EIS/SEIR.

On April 17, 1995, the Forest Service and CPUC issued a draft EIS/SEIR. Like the Final EIR for the 1991 original PPSI Project, the Draft EIS/SEIR again concluded that the reconfigured PPSI Project was environmentally superior to the "no project" (status quó) alternative, other transportation modes, other routes, and other competing pipeline project alternatives.

## C. The Competing Cajon/EPTC Project

In October 1994, the CPUC authorized Edison to use the Edison Pipeline and Terminal Company ("EPTC")[1] fuel oil pipeline and related storage system to transport and store petroleum products, including crude oil, for non-electric utility purposes. After the CPUC authorization, Edison became interested in activities which would allow additional use of the EPTC pipeline and storage facilities to generate more revenue for the benefit of Edison shareholders and ratepayers.[2]

On May 5, 1995, Edison entered into an agreement with Cajon, one of PPSI's competitors. Under this Edison/Cajon agreement, Cajon agreed to replace the last 59 miles of its original pipeline project with 66 miles of an existing fuel oil pipeline (and related oil storage facilities) owned by EPTC ("Cajon/EPTC Project").

## D. The Draft EIR/SEIR

The public comment period on the draft EIS/SEIR began on April 18, 1995 and ended on June 19, 1995. On June 19, 1995 (the final day of the public comment period), the existence of the Cajon/EPTC Project was first brought to the attention of the Forest Service and its environmental consultant on the EIS/SEIR, Aspen Environment Group ("Aspen"), in comments concerning the Draft EIS/SEIR that were submitted by Cajon Pipeline Company. Edison did not submit any written comment on the Draft EIS/SEIR during the public comment period.

On or about July 12, 1995, Aspen contacted Edison and asked it to provide additional information concerning the new Cajon/EPTC alternative. Edison personnel had several telephone conversations with the Aspen environmental consultants regarding this alternative. On July 19, 1995, Aspen sent a letter to Edison requesting responses to sections of

---

1. EPTC is a division of Edison.

2. Pursuant to the terms of Edison's settlement agreement with the CPUC's Division of Ratepayer Advocates, Edison shareholders receive 87.5% of total gross contract revenues from use of the EPTC pipeline, and Edison ratepayers receive 12.5%.

Cajon's public comment to the Forest Service and to a list of questions enclosed with the letter. On July 28, 1995, Edison sent a letter to the CPUC responding to Aspen's inquiries. In that letter, Edison noted that the nature of the information that should be included in the EIS/SEIR about the new Cajon/EPTC alternative route required circulation of a revised Draft EIS/SEIR for the reconfigured PPSI Project. Despite Edison's urging, the Forest Service decided not to prepare and circulate a revised Draft EIS/SEIR for the reconfigured PPSI project.

From August 21, 1995 to November 28, 1995, Edison engaged in several rounds of written and telephonic correspondence with Aspen and the CPUC regarding the Cajon/EPTC alternative. Also during this period, on August 25, 1995, Edison representatives met in person with Aspen, Forest Service, and CPUC personnel to provide information on the Cajon/EPTC project.

### E. The Final EIS/SEIR

On January 2, 1996, the Final EIS/SEIR for the PPSI project was released by the Forest Service. This document contained an analysis of the new Cajon/EPTC alternative, as well as another alternative that would combine the PPSI and EPTC systems. However, the final EIS/SEIR concluded that the reconfigured PPSI Project was environmentally superior to both existing oil transportation modes and other alternatives, including the new Cajon/EPTC and the PPSI/EPTC alternatives.

### F. Edison's and the City's Appeals

After the Final EIS/SEIR was issued in favor of PPSI and against Edison, Edison and the City engaged in a series of administrative and legal appeals.

#### 1. Appeals before the CPUC and the California Supreme Court

On January 24, 1996, Edison sought to intervene as an Interested Party in the CPUC's PPSI application process because the final EIS/SEIR "discusses [and rejects] the use of an existing Edison-owned pipeline for petroleum product transportation systems." In support of its proposed intervention, Edison admitted that its "[i]ntervention at an earlier stage in the proceeding was unnecessary because of a lack of impact upon Edison.... Edison must become a party at this time to fully protect the [economic] interests of our shareholders and ratepayers." [McMorrow Decl., Ex. 3 at pp. 2–4]. On February 27, 1996, the CPUC denied Edison's motion to intervene on grounds that Edison was not a party, and that Edison's arguments did not demonstrate legal error.

The CPUC certified the Final EIS/SEIR under CEQA and approved the reconfigured PPSI Project on April 10, 1996. On April 22, 1996, Edison and the City filed applications for rehearing of the CPUC decision to approve the reconfigured PPSI Project. Both applications were denied on July 17, 1996.

On August 15, 1996, the City filed a Petition for Writ of Review in the California Supreme Court. The City's petition incorporated Edison's allegation regarding the comparative environmental analysis of the reconfigured PPSI Project and the Cajon/EPTC alternative. On October 16, 1996, the California Supreme Court summarily denied the petition.

#### 2. Appeals before the Forest Service and the Instant Case before This Court

On January 31, 1996, Edison sent a letter to the Forest Service outlining its perceived problems with the analysis in the Final EIS/SEIR. Edison claimed that the Final EIS/SEIR contained many errors in its analysis of the Cajon/EPTC alternative, and requested that the document be corrected. On March 7, 1996, the Forest Service issued a Record of Decision ("ROD") approving the final EIS/SEIR and authorizing the PPSI Project in the Angeles National Forest. On April 23, 1996, Edison filed an attempted administrative appeal challenging the ROD. The City also filed an appeal of the Forest Service ROD. After meetings amongst the interested parties, the Forest Service dismissed Edison's appeal on May 13, 1996 because Edison had failed to provide comments during the public comment period on the Draft EIS/SEIR. The Forest Service did,

however, accept Edison as an interested party in the City's appeal of the ROD. On June 28, 1996, the Forest Service denied the City's appeal of the ROD.

■ Finally, on September 13, 1996, Edison and the City filed a Complaint in this court for declaratory and injunctive relief against PPSI and the Federal Defendants for violations of the NEPA. In the Complaint, Edison asserts that construction of the PPSI will cause substantial *environmental* injury to Edison within a zone of interest of NEPA in that, *inter alia:*

(a) A failure of the PPSI crude oil pipeline adjacent to or crossing Edison's transmission lines, or adjacent to an Edison substation, *could* result in a fire or other damage causing a power blackout and damaging Edison's property and facilities;

(b) Cleanup activities associated with a pipeline rupture and oil spill *could* restrict Edison's access to its transmission lines and use of its rights of way;

(c) Construction of the pipeline would take place in many areas of unstable geology, and *could* reduce slope stability near Edison facilities and transmission structures;

(d) Pipeline ruptures *could* endanger Edison employees as well as the general public;

(e) PPSI's use of heavy equipment during construction of its project *could* interfere with Edison's operation and maintenance of its transmission facilities; and

(f) The construction of the PPSI project *would* lead to increased maintenance costs for Edison, including costs for additional grading, erosion control, drainage system maintenance, patrolling insulation washing, and line clearing.[3] (emphasis added)

Edison supports these allegations with the Declarations of Neil Barry and Gary Tarplee. The Barry Declaration essentially mirrors and elaborates upon the allegations above, and also describes the proximity of the reconfigured PPSI Project to Edison facilities. In summary, the reconfigured PPSI Project intersects Edison's 66 kilovolt transmission lines at least 49 times, crosses its 220 kilovolt transmission lines at least 39 times, and would cross Edison's 500 and 1000 kilovolt lines at least sixteen times. The reconfigured PPSI Project would also run adjacent to ten Edison substations. The Tarplee Declaration describes the effect of past power outages and basically foretells the various disasters that *could* befall the Edison system and, consequently, all Edison electricity consumers *if* a rupture in the reconfigured PPSI Project were to cause damage to the system.

## IV. Discussion

### A. Summary Judgment Standard

It is the burden of the party who moves for summary judgment to establish that there is "no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *British Airways Bd. v. Boeing Co.,* 585 F.2d 946, 951 (9th Cir.1978), *cert. denied,* 440 U.S. 981, 99 S.Ct. 1790, 60 L.Ed.2d 241 (1979). If the moving party has the burden of proof at trial (the plaintiff on a claim for relief, or the defendant on an affirmative defense), the moving party must make a showing sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party. *Calderone v. United States,* 799 F.2d 254, 259 (6th Cir. 1986) (quoting W. Schwarzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact,* 99 F.R.D. 465, 487–88 (1984)). This means that, if the moving party has the burden of proof at trial, that party must establish beyond

---

**3.** The fact that nearly all of Edison's alleged environmental injuries are phrased in speculative terms raises some concern that they are "conjectural" or "hypothetical" injuries insufficient to confer standing under Article III of the Constitution. *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324–25, 82 L.Ed.2d 556 (1984); Laurence H. Tribe, *American Constitutional Law*

§ 3–16, p. 114 (2d ed. 1988). However, even if Edison's most dire allegations are wholly speculative, allegation (f) noted above does describe a "distinct and palpable" injury sufficient to meet the "injury-in-fact" requirement for Article III standing. *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206–07, 45 L.Ed.2d 343 (1975); Tribe, *supra.*

peradventure *all* of the essential elements of the claim or defense to warrant judgment in that party's favor. *Fontenot v. Upjohn Co.,* 780 F.2d 1190, 1194 (5th Cir.1986). Furthermore, the court must view the evidence presented to establish these elements "through the prism of the substantive evidentiary burden." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986).

If the opponent has the burden of proof at trial, then the moving party has no burden to negate the opponent's claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). In other words, the moving party does not have the burden to produce *any* evidence showing the absence of a genuine issue of material fact. *Id.* at 325, 106 S.Ct. at 2553–54. "Instead, ... the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.*

Once the moving party satisfies this initial burden, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings ... [T]he adverse party's response ... *must set forth specific facts* showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e) (emphasis added). A "genuine issue" of material fact exists only when the nonmoving party makes a sufficient showing to establish an essential element to that party's case, and on which that party would bear the burden of proof at trial. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which a reasonable jury could reasonably find for plaintiff." *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512. The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor. *Id.* at 248, 106 S.Ct. at 2510; *Griffeth v. Utah Power & Light Co.,* 226 F.2d 661, 669 (9th Cir.1955).

A party invoking federal jurisdiction bears the burden of proving its standing. *See Lujan v. National Wildlife Federation,* 497 U.S. 871, 884–88, 110 S.Ct. 3177, 3186–89, 111 L.Ed.2d 695 (1990) (*"Lujan I"*). "In response to a summary judgment motion, [ ] the plaintiff can no longer rest on ... 'mere allegations,' [of standing] but must 'set forth' by affidavit or other evidence 'specific facts.'" *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 2137, 119 L.Ed.2d 351 (1992) (*"Lujan II"*) (citation omitted).

**B. Analysis**

The court will not re-address the comparative merits and deficiencies of the competing pipeline projects, nor will it address the propriety of federal agency decisions regarding the environmental evaluation of the two projects. Rather, the analysis is confined to the solitary issue of whether Edison has standing to assert a claim for NEPA violations against the Federal Defendants and PPSI. The underlying facts pertaining to the standing issue, noted above, are either uncontroverted, uncontrovertible, or construed in favor of Edison.

**1. Standing under NEPA**

In *Lujan II, supra,* the Supreme Court delineated the three minimum constitutional requirements necessary to convey standing to challenge an alleged injury. First, the plaintiff must allege an actual or imminent invasion of a concrete and legally protected interest. Second, there must be a causal connection between the injury and the alleged harmful conduct. Third, it must be likely that a favorable decision will redress the injury. *Lujan,* 504 U.S. at 560–61, 112 S.Ct. at 2136–37; *Western Radio Services Company, Inc. v. Espy,* 79 F.3d 896 (9th Cir.1996).

██ In addition to these basic constitutional standing requirements, a plaintiff suing under NEPA must also meet additional standing requirements particular to NEPA. NEPA does not, in and of itself, confer a private right of action. *See Westlands Water Dist. v. U.S. Dept. of Interior,* 850 F.Supp. 1388, 1411 (E.D.Cal.1994). NEPA suits are reviewed under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 et seq. *See Western Radio,* 79 F.3d at 902, *citing,*

*Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 375–76, 109 S.Ct. 1851, 1860–61, 104 L.Ed.2d 377 (1989). The APA provides that a plaintiff seeking to challenge an agency action must be "adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. Thus, in order to meet the additional standing requirements under the APA/NEPA, a plaintiff must assert an interest "arguably within the *zone of interests* to be protected or regulated by [NEPA]." *Nevada Land Action Association v. United States Forest Service,* 8 F.3d 713, 715–16 (9th Cir. 1993), *quoting Ass'n of Data Processing Serv. Org., Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 829–30, 25 L.Ed.2d 184 (1970) ("*Camp*") (emphasis added).

■ The "zone of interest" test is a guide for deciding whether a particular plaintiff should be granted standing to complain of a particular agency decision. *Clarke v. Securities Industry Ass'n,* 479 U.S. 388, 399, 107 S.Ct. 750, 757, 93 L.Ed.2d 757 (1987). In a case where the plaintiff is not itself the subject of a contested regulatory action, the test denies a right of review if the plaintiff's interests are "marginally related to or inconsistent with the purposes implicit in the statute...." *Id.* The "zone of interest" test seeks "to exclude those plaintiffs whose suits are more likely to frustrate than to further

statutory objectives." *Id.* at 397, n. 12, 107 S.Ct. at 756, n. 12. In *Clarke,* the Supreme Court clarified the purpose underlying the test, which was "to ensure that the [plaintiff in an APA suit] would be a 'reliable private attorney general to litigate the issues of the public interest in the present case.'" *Id., quoting Camp,* 397 U.S. at 154, 90 S.Ct. at 830.

■ Accordingly, in order to challenge the Forest Service under NEPA, Edison must allege that its injury is within the "zone of interests" protected by NEPA. In order to pass the "zone of interest" test, Edison must: (a) allege a non-pretextual environmental injury;[4] (b) show that its claim is more than "marginally related" to, and not "inconsistent with," the purposes that underlie NEPA;[5] and (c) be a "reliable private attorney general to litigate the issues of the public interest in the present case" in that Edison's interests in the litigation must not be "more likely to frustrate than to further statutory objectives."[6] For reasons discussed below, the court finds that Edison fails to meet the requirements of the "zone of interest" test.

#### a. Pretextual Environmental Injury

Defendants argue that Edison's interests in this litigation are solely economic.[7] Impliedly, therefore, Defendants argue that Edi-

---

4. *See Westlands Water Dist.,* 850 F.Supp at 1412 (standing granted where plaintiff alleged both economic and environmental injury, and economic injury was not a mere pretext to redress purely economic concerns).

5. *Clarke,* 479 U.S. at 399, 107 S.Ct. at 757. NEPA was enacted in order "to declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; [and] to enrich the understanding of the ecological systems and natural resources important to the Nation." 42 U.S.C. § 4321. The purpose of NEPA is to protect the environment, not the economic interests of those adversely affected by agency decisions. *Portland Audubon Soc'y v. Hodel,* 866 F.2d 302, 309 (9th Cir.) *cert denied,* 492 U.S. 911, 109 S.Ct. 3229, 106 L.Ed.2d 577 (1989). Therefore, "a plaintiff who asserts purely economic injuries does not have standing to challenge an agency action under NEPA." *Nevada Land Action,* 8 F.3d at 716. However, the presence of an economic injury, if

the plaintiff also asserts environmental concerns, does not necessarily preclude standing. *See Westlands Water Dist.,* 850 F.Supp. at 1411, *citing Realty Income Trust v. Eckerd,* 564 F.2d 447, 452 (D.C.Cir.1977). The presence of plaintiff's economic interest, however, must not create a conflict with the neutral representation of the public interest such that plaintiff's suit is "more likely to frustrate than to further statutory objectives." *Clarke,* 479 U.S. at 397, n. 12, 107 S.Ct. at 756, n. 12. *See also Bennett v. Plenert,* 63 F.3d 915, 920 (9th Cir.1995) (denying APA standing because plaintiffs' claims were marginally related to and inconsistent with the purposes of the Endangered Species Act).

6. *Clarke,* 479 U.S. at 397, n. 12, 107 S.Ct. at 756, n. 12.

7. A plaintiff who asserts purely economic injuries does not have standing to challenge an agency action under NEPA. *See Western Radio,* 79 F.3d at 903, citing *Nevada Land Action,* 8 F.3d at 716.

son's alleged non-economic environmental injuries are pretextual proxies for its economic interest.

Certain facts support the argument that Edison's environmental injuries are pretextual. For example, Edison did not participate in the initial state EIR process concerning the 1991 original PPSI Project despite the fact that this project environmentally impacted Edison property in ways similar to those noted in this suit. Also, Edison admitted to the CPUC that it failed to participate in earlier stages of the EIS/SEIR process (including the public comment period) concerning the 1993 reconfigured PPSI Project because of a "lack of impact upon Edison." In short, it appears that although the alleged environmental impacts were present in 1991, Edison did not seek to intervene until it was economically impacted in 1995. Finally, it appears that Edison's appeals of agency decisions approving the reconfigured PPSI Project focused on the relative merits of the Cajon/EPTC alternative, not the alleged environmental impacts on Edison's property.

Despite the strong evidence supporting the inference that Edison's alleged environmental injuries are pretextual, the court declines to reach this issue. As discussed below, this issue is not determinative of the court's final ruling.

### b. Marginal Relation to or Inconsistency With the Purposes of NEPA

Defendants also argue that, to the extent to which Edison alleges any non-economic environmental injury, these injuries are so subordinate to its primary economic injury as to preclude standing. In support of their argument, Defendants cite *Hiatt Grain & Feed, Inc. v. Bergland,* 446 F.Supp. 457, 486–88 (D.Kan.1978), *aff'd on other grounds,* 602 F.2d 929 (10th Cir.1979) *cert. denied,* 444 U.S. 1073, 100 S.Ct. 1019, 62 L.Ed.2d 755 (1980). In *Hiatt,* the plaintiff claimed that the availability of price supports to competitors would lead to a massive shifting of grain from independent dealers to cooperatives, and argued that this shift in business would require more energy in transporting grain and would increase air pollution from grain handling. In denying standing under NEPA, the *Hiatt* court stated as follows:

[the alleged environmental injuries are] so attenuated, so speculative, and so obviously subordinate to plaintiff's primary economic interest that we cannot conclude that these plaintiff class members who have not suffered any injury within the "zone of interests" protected by N.E.P.A. should be allowed to represent an alleged "public interest" in this matter. *Id.* at 488.

Defendants argue that Edison's claim is only "marginally related to" and is also "inconsistent with" the purposes of NEPA. Although the court has declined to find that Edison's environmental injuries are a mere pretext, the evidence noted above clearly shows that Edison's interests in this claim are primarily economic. Further, these economic interests are of such magnitude as to render Edison's claims in conflict with a general public interest in the environment. To allow a direct competitor, under the banner of environmental champion, to raise an interminable series of legal challenges to a project approved by federal and state agencies would be "so marginally related to [and] inconsistent with the purposes implicit in [NEPA]" that it cannot reasonably be assumed that Congress intended to permit Edison's suit. *Clarke,* 479 U.S. at 399, 107 S.Ct. at 757.

### c. More Likely to Frustrate than to Further Purposes of NEPA.

The purpose of the "zone of interest" test is "to exclude those plaintiffs whose suits are more likely to frustrate than to further statutory objectives." *Nevada Land Action,* 8 F.3d at 716, *quoting, Clarke,* 479 U.S. at 397 n. 12, 107 S.Ct. at 756 n. 12. To ensure this objective, a proper NEPA plaintiff must be a "reliable private attorney general to litigate the issues of the public interest in the present case." *Clarke,* 479 U.S. at 397 n. 12, 107 S.Ct. at 756 n. 12, *quoting, Camp,* 397 U.S. at 154, 90 S.Ct. at 830. Due to Edison's extreme economic conflict with litigation in the public interest, Edison does not qualify as a "reliable private attorney general." As noted by the *Hiatt* court, NEPA was not intended to be a "general enabling statute allowing opponents of federal projects to sue solely by invoking the magic word 'environment'...." 446 F.Supp. at 488, *quoting Cummington*

*Preservation Comm. v. F.A.A.*, 8 E.R.C. 1121, 1123 (D.Mass.1975) *aff'd on other grounds*, 524 F.2d 241 (1st Cir.1975). · The fact that Edison alleges an environmental injury does not obviate Edison's economic conflict of interest.

The court's ruling is restricted to the narrow facts of this case, and does not stand for the broad proposition that any economic interest must necessarily lead to a conflict which defeats NEPA standing. Rather, the court finds that Edison is a direct competitor of the PPSI project, and that Edison could reap enormous economic benefits from alterations in the Forest Service decision. Because allowing Edison to proceed would therefore be "more likely to frustrate than to further" the objectives of NEPA, Edison lacks standing under NEPA. *Nevada Land Action*, 8 F.3d at 716. This conclusion renders Edison particularly unsuited to prosecute this particular case in the public interest.

### 2. Edison's Alternative Claims to Standing

Standing under NEPA is determined solely according to the standards articulated above. Edison, however, has articulated alternative bases for its standing, which will be briefly discussed below.

### a. Edison's claim of "Paradigm" Standing

In its Opposition, Edison announces that "[t]he paradigm case of environmental standing under NEPA is the homeowner who lives next to the proposed site of a federally licensed dam." Edison's argument, based on a single footnote in the Supreme Court's opinion in *Lujan II*, 504 U.S. at 572, n. 7, 112 S.Ct. at 2142, n. 7, is that Edison is analogous to that homeowner. In relevant part, the Court states in footnote 7:

8. In this case, the Forest Service did not fail to prepare an environmental impact statement. The Forest Service went to great lengths to analyze the Cajon/EPTC proposal and considered comments and data submitted by Edison after the public comment period. The Final EIS/SEIR did, in fact, consider and analyze the Cajon/EPTC proposal. Further, in the *Lujan II* footnote, the hypothetical homeowner, unlike

[U]nder our case law, one living adjacent to the site for construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement. *Id.*

This footnote does not alter the court's analysis for several reasons. First, the portion of the footnote relied on by Edison is dicta. Second, even if that portion of the footnote had the force of precedent, the facts in this case are distinguishable.[8] Finally, this footnote in *Lujan II* does not exempt Edison from meeting the standards of *Clarke*, which have been applied above.

### b. Edison's claim of Standing Due to Economic Injury Directly Linked to Environmental Harm

Edison claims that it has standing under the Ninth Circuit's holding in *Port of Astoria v. Hodel*, 595 F.2d 467, 476 (9th Cir.1979).[9] In *Hodel*, several plaintiffs alleged that the construction of an aluminum reduction plant would severely impact the environment. Another plaintiff, Hermiston Broadcasting Company, complained only that power transmission lines to be built to service the plant would interfere with Hermiston's broadcasts. *Hodel* held that the primary impact of the plant was environmental, and that Hermiston had standing because its purely economic injuries were "causally related to an act that lies within NEPA's embrace." *Hodel*, 595 F.2d at 476. Because Edison's allegedly non-economic environmental injuries (which Defendants argue are a pretext for economic injuries) are related to possible environmental damage from the PPSI Project, Edison argues that, even if the court characterized its injuries as purely economic, *Hodel* would confer standing upon Edison.

This argument does not alter the court's ruling for three distinct reasons. First, the court has declined to characterize Edison's alleged environmental injuries as a pretext

Edison, did not own an interest in a competing proposal.

9. The Ninth Circuit has noted that its narrow holding in *Hodel* is in apparent conflict with its broader and more recent holding in *Nevada Land Action*. *See Western Radio*, 79 F.3d at 903. That apparent conflict has not been resolved and, for reasons noted herein, need not be resolved here.

for economic injury. Second, Edison's truly economic injury (the economic injury of having the reconfigured PPSI authorized and approved, instead of the Cajon/EPTC alternative pipeline) is not causally related to any environmental damage whatsoever. Third, the narrow holding in *Hodel* does not exempt Edison from meeting the later-articulated requirements of *Clarke.*

### c. Edison's Claim of Procedural Standing

■■■ Edison further argues that it has "procedural standing" [10] to cause the Forest Service to prepare a supplement to its Final EIS/SEIR according to 40 C.F.R. § 1502.9(c)(1).[11] Edison supports this proposition by citing *Douglas County v. Babbitt,* 48 F.3d 1495 (9th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct 698, 133 L.Ed.2d 655 (1996). In *Douglas County,* the court held:

> To find that the County's interests do not fall inside the "zone of interests" protected by NEPA, we would have to find that (1) the County's interests are inconsistent with the purposes of NEPA, and that (2) the interests are so inconsistent that it would be unreasonable to assume that Congress intended to permit the suit. *Id.* at 1500 (citations omitted).

Edison's argument does not alter this court's ruling. This court independently made the necessary findings articulated by the *Douglas County* court to deny standing to Edison. The *Douglas County* court's conclusion that Douglas County had standing does not alter this court's analysis of those factors and its conclusion that Edison should be denied standing under the standards articulated in *Clarke.*

### d. Edison's Claim of Vicarious Standing

Finally, Edison argues that it has standing because, as a general rule, if one plaintiff (the City) has standing,[12] the courts *may* decline to contest the standing of the other plaintiffs. *See e.g. Watt v. Energy Action Educational Found.,* 454 U.S. 151, 161, 102 S.Ct. 205, 212–13, 70 L.Ed.2d 309 (1981). However, Edison has not provided any reason why this court *should* decline to consider its standing. In this case, the court has considered Edison's standing, and has found that Edison is not a proper NEPA plaintiff.

### 3. Exhaustion of Administrative Remedies

Defendant PPSI argues, in the alternative, that Edison should be dismissed as a party to this suit because Edison failed to exhaust its administrative remedies before bringing this suit. Because the court has found that Edison lacks standing under NEPA, it is unnecessary for the court to reach the exhaustion issue.

### V. Conclusion

For all of these reasons, the Court hereby ORDERS that Defendants' Motions for Summary Judgment on the issue of Edison's Standing are GRANTED.

**SO ORDERED.**

---

**10.** Edison's so-called "procedural standing" is in no way distinct from ordinary NEPA standing articulated above. NEPA standing is procedural standing. The Supreme Court confirmed this fact in *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 350, 109 S.Ct. 1835, 1845–46, 104 L.Ed.2d 351 (1989). There, the Court explained that "[t]he sweeping policy goals announced in ... NEPA are ... realized through a set of 'action-forcing' *procedures* that require agencies to take a 'hard look at the environmental consequences.' " *Id.* (emphasis added). The Court also noted that "NEPA does not mandate particular results, but simply prescribes the necessary *process.*" *Id.* (emphasis added).

**11.** In relevant part, 40 C.F.R. § 1502.9 states:

(c) Agencies:

(1) Shall prepare supplements to either draft or final environmental impact statements if:

(I) The agency makes substantial changes in the proposed action that are relevant to environmental concerns.

(ii) There are significant new circumstances or information relevant to environmental concern and bearing on the proposed action of its impacts.

**12.** The court notes that in responding to Edison's claim of vicarious standing, PPSI and the Federal Defendants have challenged the standing of the City in their Reply. Because this issue is raised for the first time in the Defendants' Replies, it is of course not properly before the court. Accordingly, the court did not to consider the issue of the City's standing in its ruling on Edison's standing.