Steven Lewis KANDRA; David Cacka; Klamath Irrigation District; Tulelake Irrigation District; and Klamath Water Users Association, Plaintiffs,

and

City of Klamath Falls, Klamath County, Modoc County, and Lon Bailey, Plaintiffs–Intervenors,

v.

UNITED STATES of America; Gale Norton, Secretary of the Interior; Don Evans, Secretary of Commerce, Defendants,

and

Klamath Tribes; Yurok Tribe; the Wilderness Society, et al., Defendants–Intervenors,

No. CIV. 01–6124–AA.

United States District Court, D. Oregon.

April 30, 2001.

---

Stephen A. Hutchinson, Douglas M. Du-Priest, Hutchinson, Cox, Coons & DuPriest, Eugene, OR, Stuart L. Somach, Paul S. Simmons, John A. Mendez, Somach, Simmons & Dunn, Sacramento, CA, William M. Ganong, Klamath Falls, OR, for plaintiffs.

Richard C. Whitlock, City Attorney, Klamath Falls, OR, for plaintiff-intervenor City of Klamath Falls.

Reginald R. Davis, Klamath County Counsel, Klamath Falls, OR, for plaintiff-intervenor Klamath County.

Thomas M. Buckwalter, Modoc County Counsel, Alturas, OR, for plaintiff-intervenor Modoc County.

Laura A. Schroeder, Steven Lee Shropshire, Schroeder Law Offices, Portland, OR, for plaintiff-intervenor Lon Bailey.

James L. Sutherland, Assistant United States Attorney, Eugene, OR, Lyn Jacobs, United States Department of Justice, Environment & Natural Resources Division, Wildlife & Marine Resources Section, Washington, DC, Stephen M. MacFarlane, United States Department of Justice, Environment & Natural Resources Division, Sacramento, CA, David W. Harder, United States Department of Justice, Environment & Natural Resources Division, Indian Resources Section, Denver, CO, for defendants.

Carl V. Ullman, Klamath Tribes Water Adjudication Project, Chiloquin, OR, Lea Ann Easton, Native American Program Oregon Legal Services, Portland, OR, Walter Echo–Hawk, Native American Rights Fund, Boulder, CO, for defendant-intervenor Klamath Tribes.

Curtis G. Berkey, Scott W. Williams, Alexander & Karshmer, Berkeley, CA, for defendant-intervenor Yurok Tribe.

Jan E. Hasselman, Todd D. True, Earthjustice Legal Defense Fund, Seattle, WA, Peter M.K. Frost, Eugene, OR, Robert G. Hunter, Medford, OR, for defendants-intervenors The Wilderness Society, Waterwatch of Oregon, Pacific Coast Federation of Fishermen's Associations, Institute for Fisheries Resources, Oregon Natural Resources Council, Northcoast Environmental Center, and Klamath Forest Alliance.

Frank DeMarco, Siskiyou County Counsel, William Standley, Assistant County Counsel, Donald R. Langford, Mary Frances McHugh, Deputies County Counsel, Yreka, CA, for amicus curiae Siskiyou County.

## OPINION AND ORDER

AIKEN, District Judge.

Plaintiffs move for a preliminary injunction against defendant United States of America, Department of Interior, enjoining the Bureau of Reclamation ("Reclamation") from implementing the Klamath Reclamation Project 2001 Annual Operations Plan ("2001 Plan" or "Plan"). Under the 2001 Plan, water elevations of Upper

Klamath Lake and water flows below Iron Gate Dam will be maintained to support endangered sucker fish and threatened coho salmon. Due to inadequate water supplies, no irrigation water deliveries will be made to the majority of land within the Klamath Reclamation Project ("Project"). Plaintiffs seek an order enjoining Reclamation from implementing the Plan and ordering Reclamation to release unspecified "historic" amounts of irrigation water. In the alternative, plaintiffs request that the court order Reclamation to release 262,000 acre feet of water, resulting in an Upper Klamath Lake elevation of 4138 at the end of September, which allocates roughly fifty percent of stored water and inflow to Project irrigators.

Plaintiffs claim that the 2001 Plan breaches their contractual rights to irrigation water and is arbitrary and capricious under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, in that its implementation violates the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, et seq., and the Endangered Species Act ("ESA"), 16 U.S.C. § 1531, et seq.

## BACKGROUND

The Project is a water storage and irrigation project serving over 200,000 acres of land in Southern Oregon and Northern California. The Project was authorized in 1905 pursuant to the Reclamation Act of 1902. 32 Stat. 388, 43 U.S.C. § 371, et seq. In accordance with state water law and the Reclamation Act, the United States "appropriated all available water rights in the Klamath River and Lost River and their tributaries in Oregon and began constructing a series of water diversion projects." *Klamath Water Users Association v. Patterson*, 204 F.3d 1206, 1209 (9th Cir.1999) ("Patterson").

Water for the Project is stored primarily in Upper Klamath Lake ("UKL") on the Klamath River. The Link River Dam, constructed near the mouth of UKL, regulates flows in the lower Klamath River. It is owned by Reclamation, but operated and maintained pursuant to contract by PacifiCorp, a power company. PacifiCorp also owns and operates the canals that carry water from UKL to the Link River, and it operates several hydroelectric and re-regulating dams on the Klamath River pursuant to a license issued by the Federal Energy Regulatory Commission. The furthest downstream of these dams is the Iron Gate Dam in California.

Reclamation must balance diverse, and often competing, demands for Project water. Reclamation must deliver water to Project irrigators in accordance with the rights held by the United States and the irrigators' individual repayment contracts, subject to the availability of water. Plaintiffs Klamath Irrigation District and Tulelake Irrigation District have rights to receive appropriated water pursuant to their contracts with Reclamation. Two national wildlife refuges, the Lower Klamath and Tule Lake National Wildlife Refuges, depend on the Project for water and receive large quantities of return irrigation flows and other Project waters.

Under the ESA, Reclamation must not engage in any action that is likely to jeopardize the continued existence of an endangered or threatened species or result in the destruction or adverse modification of the critical habitat of such a species. *See* 16 U.S.C. § 1536(a)(2). In 1988, two fish, the Lost River and shortnose suckers, were listed as "endangered" due to a decline in the species' population resulting from a fragmentation of aquatic habitat through damming, flow diversion, and decreased water quality. 53 Fed.Reg. 27130, 27131–32 (July 18, 1988). The suckers live only in UKL and nearby Project waters. They are adfluvial, in that the suckers live

mostly in UKL, migrating up tributaries to spawn.

Below Iron Gate Dam, the Klamath River is used by various species of fish, including the Southern Oregon/Northern California Coast coho salmon ("coho salmon" or "salmon"). The coho salmon was listed as "threatened" under the ESA in 1997, in part due to habitat degradation resulting from water diversions. 62 Fed. Reg. 24588, 24592 (May 6, 1997). The Klamath River from Iron Gate Dam to the Pacific Ocean has been designated as a "critical habitat" for the coho salmon. *See* 64 Fed.Reg. 24049 (May 5, 1999). The coho are anadromous, in that they migrate from the ocean to fresh water to spawn.

Large numbers of bald eagles migrate into the Klamath Basin during fall and winter. The eagles, listed as "threatened" under the ESA, rely heavily on the abundant waterfowl that use the Lower Klamath National Wildlife Refuge, which receives water from Project operations.

Finally, Reclamation must also consider the rights of Indian tribes, including defendants-intervenors Klamath and Yurok Tribes, who hold fishing and water treaty rights in the Klamath River Basin. The Tribes retained these rights pursuant to treaties in which they ceded millions of acres of land to the United States. *See Parravano v. Babbitt*, 70 F.3d 539, 541–42, 545 (9th Cir.1995); *United States v. Adair*, 723 F.2d 1394, 1414 (9th Cir.1983). The endangered suckers, called "c'wam" by the Klamath Tribes, play an integral role in the Klamath Tribes' customs and traditions. Prior to its closing in 1986, Klamath Tribes maintained a c'wam fishery which provided a source of food and income for tribal members. Declaration of Elwood Miller, ¶¶ 5–9. The threatened coho salmon are equally important to the Yurok Tribe, providing a source of food, opportunities for employment and income, and the basis of Yurok customs and traditions.

Declaration of Glenn Moore, ¶¶ 4, 6, 8, 11. Reclamation has an obligation to protect tribal trust resources such as the sucker fish and salmon. *Patterson*, 204 F.3d at 1213; *Parravano*, 70 F.3d at 547; *Adair*, 723 F.2d at 1408–11, 1415.

Several constraints force Reclamation "to walk a water-management tightrope in dry years." Defendants' Opposition to Motion for Preliminary Injunction, p. 6. Unlike other Reclamation projects, the Project does not have a major water storage reservoir. Yearly water levels of UKL vary, largely depending on the previous winter's snowfall and the amount of precipitation during the spring and summer. UKL is relatively shallow and unable to capture and store large quantities of water from spring run-off. Consequently, the Project's storage capacity is limited, and Reclamation cannot store water during years of heavy precipitation to meet water needs in dry years.

To prepare Project operation plans, Reclamation relies on the Natural Resources Conservation Service ("NRCS") Streamflow Forecast for the Upper Klamath Basin. NRCS issues its forecasts on a monthly basis, between January and June, for the period from April 1 to September 30. The Project's primary irrigation season begins in late March, shortly after Reclamation receives the first streamflow forecasts.

In light of the diverse water demands, Reclamation initiated a public process to establish a new long-term operating plan. For the past several years, Reclamation has issued one-year interim plans while formulating a long-term plan for water distribution. Reclamation issues the annual plans in order to provide operating criteria and to assist water users and resource managers in planning for the water year. Although anticipated several years

ago, a long-term plan has not been completed.

Based on NRCS forecasts, Reclamation has defined the 2001 water year as "critical dry." As of April 6, 2001, Reclamation determined that inflow volume into UKL would be 108,000 acre feet during the period of April through September, the smallest amount of inflow on record.

On January 22, 2001, Reclamation forwarded a biological assessment of the Project's effects on the coho salmon to the National Marine Fisheries Service ("NMFS") and requested the initiation of formal consultation under the ESA. Similarly, on February 13, 2001, Reclamation forwarded a biological assessment of the Project's effects on the shortnose and Lost River suckers to the United States Fish and Wildlife Service ("FWS") and requested formal consultation. Reclamation's biological assessments concluded that the Project's continuing operations were likely to adversely affect the sucker species and the coho salmon.

FWS began formal consultation and issued a draft Biological Opinion ("BiOp") on March 13, 2001. The draft BiOp concluded that the sucker populations in UKL are at risk from adverse water quality, loss of habitat, entrainment, and lack of passage. The BiOp stated that development and operations of the Project were major factors contributing to the loss and degradation of aquatic habitat and the endangered status of the suckers. In accordance with the ESA and governing regulations, FWS proposed "reasonable and prudent alternatives" ("RPAs") to the proposed operation of the Project that would not cause jeopardy. 16 U.S.C. § 1536(b)(3)(A). FWS proposed an RPA of minimum UKL surface elevations between 4140 and 4142.5 feet from January through October 15.[1]

NMFS completed a draft BiOp on March 19, 2001. The draft BiOp concluded that the Project's operations would jeopardize coho salmon and proposed RPAs of minimum water flows in Klamath River below Iron Gate Dam.

Upon review of the draft BiOps, Reclamation informed FWS and NMFS that the forecasted water supplies for 2001 were not adequate to meet the needs of both RPAs. On April 6, 2001, FWS and NMFS released their final BiOps on the effects of the Project on the suckers, coho salmon, and bald eagles. FWS Administrative Record ("FWS AR"), Addendum 2; NMFS Administrative Record ("NMFS AR"), Volume III, 105. FWS and NMFS again concluded that operation of the Project, as initially proposed by Reclamation, would jeopardize the continued existence of the suckers and the coho salmon. The FWS BiOp concluded that the Project's operations would cause harm, but not jeopardy, to the continued existence of the bald eagles.

FWS and NMFS adjusted the minimum UKL elevations and Klamath River flows to reflect the reduced water available for the 2001 water year. FWS proposed a minimum UKL elevation of 4139, provided a minimum surface level of 4140 was sustained on a long-term basis. The minimum elevation RPA is intended to increase water quality and the physical habitat for juvenile and adult suckers, and provide for access to spawning areas.

NMFS proposed a range of minimum instream flows in the Klamath River below Iron Gate Dam from April through September, from a low of 1,000 cubic feet per

---

1. A FWS BiOp prepared in 1992 recommended lower lake elevations in UKL. Relying on new information regarding potential adverse effects of low lake levels and massive fish kills in the 1990s, FWS concluded that higher UKL levels than those recommended in the 1992 BiOp were necessary to reduce the risk of extinction.

second ("cfs") in July through September, to a high of 2,100 cfs between June 1–15. The river flows are recommended in order to increase riparian habitat for coho salmon. The RPAs in the NMFS BiOp are limited in duration, because NMFS expects additional information regarding flow and salmon habitat will become available in the near future. NMFS represents that it will prepare a comprehensive BiOp by June 7, 2001, addressing minimum water flows below Iron Gate Dam in future critical dry years.

Also on April 6, 2001, Reclamation issued its 2001 Operations Plan, which incorporates the conclusions contained in the BiOps and implements the RPAs proposed by FWS and NMFS. After implementation of the RPAs, the availability of irrigation water is severely limited, and most Project lands will receive no water deliveries. The Plan makes available for irrigation 70,000 acre feet of water from Clear Lake and Gerber Reservoirs.[2]

Plaintiffs filed this action on April 9, 2001, and moved for preliminary injunctive relief on April 11. The court held a status conference on April 12, 2001, and ordered the defendants (hereinafter "the government") and proposed defendants-intervenors to respond by April 24, 2001, and plaintiffs to reply by April 26, 2001. The government filed the administrative record on April 18, 2001, with an Addenda filed April 25 (docs. # 46 and # 85).

Much litigation over the Project and its operations has ensued in recent years, including a case particularly relevant to plaintiffs' motion for preliminary injunction. In May 2000, various conservation and fishing interests, including several defendants-intervenors in this case, filed a

lawsuit challenging Reclamation's 2000 Plan. *Pacific Coast Federation of Fishermen's Ass'n v. Bureau of Reclamation,* 138 F.Supp.2d 1228, 2001 WL 360146 (N.D.Cal. April 3, 2001). The plaintiffs there alleged that Reclamation violated ESA, by releasing water for irrigation and water flows in the Klamath River prior to consultation with NMFS regarding the Project's effects on threatened coho salmon. The District Court for the Northern District of California agreed and issued an injunction prohibiting Reclamation from releasing any water for irrigation until Reclamation complied with its ESA obligations.

Specifically, the court ordered: "[T]he Bureau of Reclamation hereby is enjoined from sending irrigation deliveries from Klamath Project whenever Klamath River flows at Iron Gate Dam drop below the minimum flows recommended in the Hardy Phase I report, until such time as the Bureau completes a concrete plan to guide operations in the new water year, and consultation concerning that plan is completed, either by (1) formal consultation to a 'no jeopardy' finding by the NMFS, or (2) the Bureau's final determination, with the written concurrence of the NMFS, that the proposed plan is unlikely to adversely affect the threatened coho salmon." 138 F.Supp.2d at 1250–51.

On April 16, 2001, the court clarified its April 3 Order in response to a "Notice of Completion of Consultation" filed by the government. The court stated that to fulfill the requirements for termination of the injunction, Reclamation must finalize a concrete 2001 Plan, formally consult with NMFS regarding that plan, and obtain

---

2. Defendant intervenor The Wilderness Society suggests that this allocation of irrigation water violates the ESA because no water is allocated to the Lower Klamath National Wildlife Refuge, which could result in the incidental take of numerous bald eagles. *See* The Wilderness Society's Opposition to Plaintiffs' Motion for Preliminary Injunction, pp. 28–29.

from NMFS a BiOp on the effects of the 2001 Plan. Conversely, if NMFS finds that the 2001 Plan is not likely to jeopardize the existence of coho salmon or adversely modify critical habitat, the injunction may be lifted. If NMFS finds that the 2001 Plan does cause jeopardy or adversely affect critical habitat, Reclamation must notify NMFS whether it intends to proceed with the Plan, and if so, whether it will adopt any RPAs proposed by NMFS. If Reclamation intends to proceed despite a jeopardy finding and absent the RPAs proposed by NMFS, it must state the basis for its conclusion that such action does not violate the ESA. *Pacific Coast Federation of Fishermen's Ass'n v. Bureau of Reclamation*, Civ. No. 00–01955–SBA (N.D. Cal. April 16, 2001).[3]

On April 23, 2001, all parties to the litigation at bar participated for three full days in mediation proceedings directed by Magistrate Judge Thomas Coffin. Despite intense and genuine efforts by Judge Coffin and the parties, no resolution for the 2001 water year could be agreed upon, although the parties expressed an interest in continued long-term mediation with Judge Coffin. The court heard oral argument on April 27, 2001.

### STANDARD

██ The party seeking a preliminary injunction must show either (1) a combination of probable success on the merits and the possibility of irreparable injury; or (2) that serious questions are raised and the balance of hardships tips sharply in its favor. *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush and Co., Inc.*, 240 F.3d 832, 839–40 (9th cir.2001). While stated as alternatives, "[t]hese formulations are not different tests but represent two points on a sliding scale in which the degree of

irreparable harm increases as the probability of success on the merits decreases." *Big Country Foods v. Board of Educ.*, 868 F.2d 1085, 1088 (9th Cir.1989). "Even if the balance of hardships tips sharply in plaintiffs' favor, it must be shown as an irreducible minimum that there is a fair chance of success on the merits." *Stanley v. University of Southern California*, 13 F.3d 1313, 1319 (1994). Additionally, where the public interest is involved, the court must consider whether the balance of public interests weighs in favor of granting or denying the injunctive relief sought. *Westlands Water Dist. v. Natural Resources Defense Council*, 43 F.3d 457, 459 (9th Cir.1994).

### DISCUSSION

#### A. Balance of Hardships

██ Plaintiffs contend that they are entitled to preliminary injunctive relief primarily because plaintiffs, and those they represent, will suffer great harm if the 2001 Plan is implemented. There is no question that farmers who rely on irrigation water and their communities will suffer severe economic hardship if the 2001 Plan is implemented. The declarations of Steven Kandra and David Cacka, Klamath Basin farmers, describe the hardships they will suffer if their lands receive no irrigation water, including loss of income, inability to pay debts, potential loss of land and equipment, and immeasurable harm to their way of living. Declaration of Steven Kandra, ¶¶ 5–9; Declaration of David Cacka, ¶¶ 8–11. Local governmental entities in the Klamath River Basin anticipate agricultural losses in the millions of dollars, loss in revenues, and additional burdens on social services. *See, e.g.,* Declarations of William J. Stephens, Gary W. Anderson,

---

**3.** Here, neither NMFS nor FWS issued a BiOp on the effects of the final 2001 Plan; rather, the Plan and the BiOps were issued

the same day, with the Plan incorporating the RPAs contained in the BiOps.

Sharron L. Molder, Mary Frances McHugh. The court recognizes the harm that could be suffered by plaintiffs and surrounding communities. However, the court must balance that harm against the harm to the suckers and salmon, those who rely on the fish, as well as the public interest.

NMFS and FWS have determined that Project operations will cause jeopardy to the continuing existence of the suckers and coho salmon and adversely affect the critical habitat of the coho salmon. Threats to the continued existence of endangered and threatened species constitute ultimate harm. "Congress has spoken in the plainest of words, making it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities, thereby adopting a policy which it described as 'institutionalized caution.'" *Tennessee Valley Authority v. Hill,* 437 U.S. 153, 194, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978); *accord Sierra Club v. Marsh,* 816 F.2d 1376, 1383–84, 1387 (9th Cir.1987).

The Klamath and Yurok Tribes rely on the fish as a vital component of the Tribes' cultures, traditions, and economic vitality. Members of the Klamath and Yurok Tribes, Elwood Miller and Glenn Moore, describe the past and continuing hardship suffered by Tribal members as a result of the decline of their fisheries. Declaration of Elwood Miller, ¶¶ 5–11, 15, 16; Declaration of Glenn Moore, ¶¶ 6–8, 11. Many customs and traditions revolve around the fish harvest, which is now reduced, or in the case of the suckers, non-existent. Loss of fish results in a loss of food, income, employment opportunities, and sense of community.

Similarly, fishermen and fishing communities rely on coho salmon to sustain economic viability and their way of life. The public interest weighs heavily on both sides of the dispute.

Balancing these harms is a difficult task, and one that leads to no concrete determination. Given the high priority the law places on species threatened with extinction, I cannot find that the balance of hardship tips sharply in plaintiffs' favor.

*B. Breach of Contract Claim*

■ Plaintiffs allege that Reclamation breached its contracts with plaintiffs Klamath Irrigation District and Tulelake Irrigation District by using Project water for purposes other than irrigation. However, as recognized by this court and the Ninth Circuit, plaintiffs' contract rights to irrigation water are subservient to ESA and tribal trust requirements. *Patterson,* 204 F.3d at 1214. Therefore, plaintiffs cannot assert breach of contract based on Reclamation's allocation of water to protect the suckers and salmon.

Plaintiffs also allege breach of contract based on Reclamation's failure to preserve and maintain the water supply for users entitled to take or receive water under their contracts. Plaintiffs do not explain what precise action Reclamation should take to protect its water supply, although they suggest that Reclamation take legal action against junior water users outside the Project.

■ Under federal reclamation law, the Secretary of the Interior is required to proceed in conformity with state laws with respect to the control, appropriation, use, or distribution of water used in irrigation, provided such state laws are consistent with directives of Congress. *See California v. United States,* 438 U.S. 645, 668–69, 98 S.Ct. 2985, 57 L.Ed.2d 1018 (1978).

Water rights adjudication for the Klamath River Basin to perfect asserted water rights is pending in state court. *See United States v. Oregon,* 44 F.3d 758, 762 (9th Cir.1994). Apparently, numerous parties have filed pre–1909 water right claims

to the UKL and its tributaries. *See* Klamath Tribes' Memorandum in Opposition to Plaintiffs' Motion for Preliminary Injunction, p. 7. According to the government, the State of Oregon has taken the position that it will not deny existing water rights based on the claim of an alleged senior water holder during the water rights adjudication. Therefore, it appears that Reclamation is precluded from pursuing action against junior water users until all rights have been adjudicated. Regardless, plaintiffs present no specific information as to the identity of junior water users or whether Reclamation could successfully assert water rights claims against them.

Finally, plaintiffs fail to explain why Reclamation must deliver irrigation water while legal action is contemplated, particularly in light of Reclamation's obligation to protect ESA species and tribal trust resources. Thus, plaintiffs fail to show a likelihood of success on the merits of their contract claim.

### C. Administrative Procedure Act Claims

██ Plaintiffs allege that the Reclamation violated NEPA by issuing the 2001 Plan without preparing an Environmental Impact Statement, and that FWS and NMFS violated the ESA by failing to utilize the best scientific evidence available in their respective BiOps. Neither NEPA nor the ESA provide a private cause of action for the claims asserted by plaintiffs. *See Bennett v. Spear*, 520 U.S. 154, 172–73, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (judicial review of biological opinions available under the APA); *Northwest Resource Information Center, Inc. v. National Marine Fisheries Service*, 56 F.3d 1060, 1066 (9th Cir.1995) (NEPA claim reviewable under APA). Therefore, judicial review of the challenged agency actions is governed by § 706 of the APA. 5 U.S.C. § 706(2); *Pyramid Lake Paiute Tribe of Indians v. United States Dep't of Navy*, 898 F.2d 1410, 1414 (9th Cir.1990).

Under the APA, an agency decision must be upheld unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also, Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 376, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) (arbitrary and capricious standard applies to agency findings which involve agency expertise). Although the "inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). "When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Marsh*, 490 U.S. at 378, 109 S.Ct. 1851.

In other words, a court "may reverse the agency's decision as arbitrary or capricious only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, offered an explanation that ran counter to the evidence before the agency, or offered one that is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Western Radio Services Co. v. Espy*, 79 F.3d 896, 900 (9th Cir.1996) (citing *Dioxin/Organochlorine Center v. Clarke*, 57 F.3d 1517, 1521 (9th Cir.1995)).

### 1. National Environmental Policy Act

NEPA requires all federal agencies to prepare a detailed Environmental Impact Statement ("EIS") for "every recommendation or report on proposals for legislation and other major Federal actions

significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Implementing regulations provide for the preparation of an environmental assessment ("EA"), a brief preliminary evaluation which either determines that an EIS is required or concludes with a finding of no significant impact ("FONSI"). 40 C.F.R. § 1508.9. Agencies may also choose to prepare an EA as an aid to agency planning. *Id.* § 1501.3(b).

■ NEPA's purpose is to ensure informed agency action. *Swanson v. United States Forest Service,* 87 F.3d 339, 343 (9th Cir.1996). "NEPA does not mandate particular substantive results, but instead imposes only procedural requirements." *Okanogan Highlands Alliance v. Williams,* 236 F.3d 468, 473 (9th Cir.2000) (quoting *Laguna Greenbelt, Inc. v. United States Dep't of Transp.,* 42 F.3d 517, 523 (9th Cir.1994)).

Although Reclamation did not prepare an EIS, it prepared an EA for the 2001 Plan. The EA examined potential environmental effects of proposed operations in 2001 under a critical dry forecast. The EA took into account the RPAs proposed by FWS and NMFS, and the operational effects on the Projects if the RPAs were implemented. The EA also suggested five alternative operations for the Project and addressed the impacts of each alternative. Reclamation's EA did not conclude with a FONSI. In light of the extreme drought conditions and the proposed RPAs, Reclamation found that the plan could significantly affect the environment. However,

the EA did not specifically find that an EIS was required for the 2001 Plan.[4]

*a. Standing*

■ Defendants-intervenors representing conservation and fishing interests (hereinafter "The Wilderness Society") argue that plaintiffs lack standing to pursue their NEPA claim. The Wilderness Society claims that plaintiffs' alleged harm is purely economic and outside the zone of interests protected by NEPA. I disagree.

■ "NEPA's purpose is to protect the environment, not the economic interests of those adversely affected by agency decisions." *Nevada Land Action Ass'n v. United States Forest Service,* 8 F.3d 713, 716 (9th Cir.1993). Accordingly, "a plaintiff who asserts purely economic injuries does not have standing to challenge an agency action under NEPA." *Id.; accord Western Radio Services,* 79 F.3d at 902–03. Plaintiffs must assert more than economic harm or a "lifestyle loss" to invoke standing; plaintiffs must also assert that the 2001 Plan "will have a primary impact on the natural environment." *Id.* at 903 (quoting *Port of Astoria v. Hodel,* 595 F.2d 467, 476 (9th Cir.1979)); *Nevada Land Action,* 8 F.3d at 716.

Although plaintiffs emphasize their potential economic losses, they also allege harm to the natural environment. Plaintiffs allege that the 2001 Plan will impact air, water, and soil quality, as well as waterfowl and wildlife which inhabit the wildlife refuges. Complaint, ¶¶ 22, 39. Plaintiffs submit declarations in support of their allegations.[5] Accordingly, I find that

---

4. In their Reply brief, plaintiffs contend that the government, by issuing an EA, admits that the 2001 Plan triggered NEPA and that they have failed to comply with NEPA requirements. I disagree. The regulations clearly allow an agency to prepare an EA "on any action at any time" to assist in planning. 40 C.F.R. § 1501.3(b).

5. Three declarants, however, do not appear to be parties to this litigation. *See* Declarations of Larry Turner, Robert L. Crawford, and Rick Woodley. Nevertheless, the court considers the interests stated by those individuals to be similar to those which could be asserted by actual plaintiffs or plaintiff-intervenors.

plaintiffs' allegations of economic harm are coupled with environmental concerns and suffice to establish standing under NEPA.

### b. Application to Ongoing Operations

Plaintiffs argue that the "changed" operating criteria of prioritizing water for fish over irrigation purposes and the implementation of the RPAs recommended by the BiOps render the Plan a "major federal action" triggering the requirements of NEPA.[6] Plaintiffs allege that Reclamation cannot implement the 2001 Plan before it prepares an EIS describing the purpose and need for the Plan, the environmental effects of the Plan, alternatives to the Plan, and means by which the impacts of the Plan could be mitigated. Plaintiffs argue that the failure to analyze alternative sources of water hampered Reclamation's ability to meet its contractual irrigation obligations and renders the 2001 Plan arbitrary and capricious. The government responds that practical constraints preclude the application of NEPA to annual operating plans such as the 2001 Plan.

 NEPA does not apply retroactively. *See Westside Prop. Owners v. Schlesinger*, 597 F.2d 1214, 1223 (9th Cir. 1979). Therefore, an EIS cannot be required on the basis of the Project's construction. "However, if an ongoing project undergoes changes which themselves amount to 'major Federal actions,' the operating agency must prepare an EIS." *Upper Snake River Chapter of Trout Unlimited v. Hodel*, 921 F.2d 232, 234–35 (9th Cir.1990) (citing *Andrus v. Sierra Club*,

442 U.S. 347, 363 n. 21, 99 S.Ct. 2335, 60 L.Ed.2d 943 (1979)). Thus, the issue is whether the 2001 Plan constitutes a "major federal action" under NEPA.

 As an initial matter, plaintiffs' characterization of Reclamation's duty to protect ESA species and tribal resources as a "change in operations" implemented in response to various "demands" is inaccurate. *See* Plaintiffs' Memorandum in Support of Preliminary Injunction, pp. 1–2, 11. Reclamation "has responsibilities under the ESA as a federal agency. These responsibilities include taking control of the [Project] when necessary to meet the requirements of the ESA, requirements that override the water rights of the Irrigators." *Patterson*, 204 F.3d at 1213.

Similarly, the United States, as a trustee for the Tribes, is obligated to protect the Tribes' rights and resources. *See Mitchell v. United States*, 463 U.S. 206, 224–26, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983); *Patterson*, 204 F.3d at 1213. Water rights for the Klamath Basin Tribes "carry a priority date of time immemorial." *Adair*, 723 F.2d at 1414. These rights "take precedence over any alleged rights of the Irrigators." *Patterson*, 204 F.3d at 1214. Reclamation, therefore, has a responsibility to divert the water and resources needed to fulfill the Tribes' rights.

As such, Reclamation's "change in operation" is mandated by law, and the requirements of NEPA do not apply. *National Wildlife Federation v. Espy*, 45 F.3d 1337, 1343 (9th Cir.1995) (citing *Fore-*

---

6. The court notes that plaintiffs do not challenge explicitly the implementation of the RPAs in their Complaint; rather, plaintiffs limit their NEPA challenge to Reclamation's "determin[ation] that the Klamath Project will be operated for purposes other than irrigation and refuge use." Plaintiffs' Complaint for Declaratory and Injunctive Relief, ¶ 38. However, plaintiffs refer to the RPAs in their Complaint, and plaintiffs raised challenges to

the implementation of the RPAs in their briefs and during oral argument. In fact, during oral argument, plaintiffs conceded that Reclamation was bound by the ESA, but that Reclamation's discretionary action of implementing the RPAs requires an EIS. Nevertheless, plaintiffs rely heavily on their "change in operations" argument in their briefs, and I will therefore address it.

*laws on Board v. Johnson,* 743 F.2d 677, 681 (9th Cir.1984)).

■ Whether an EIS is required for the Plan's implementation of the recommended RPAs is a closer question. As plaintiffs maintain, the consequences of the 2001 Plan are unprecedented and will undoubtedly have an effect on the environment. The government concedes this point. However, under these specific circumstances, I find that the issue is "not whether the actions are of sufficient magnitude to require the preparation of an EIS, but rather whether NEPA was intended to apply at all to the continuing operations of completed facilities." *County of Trinity v. Andrus,* 438 F.Supp. 1368, 1388 (E.D.Cal.1977).

If NEPA applies to the 2001 Plan, Reclamation could not comply with the mandates of NEPA and prepare an EIS before irrigation water deliveries normally begin. An EIS takes at least several months to complete. Reclamation relies on NRCS forecasts to estimate the amount of available water and prepare an operations plan for the year. Forecasts begin in January, some two months prior to the commencement of irrigation season. These time constraints render it impossible for Reclamation to complete an EIS for an annual operating plan.

In *Trinity,* the plaintiffs sought to enjoin Reclamation from lowering the level of a reservoir during a drought year because of the potential damage to fish populations. The district court rejected the plaintiffs' NEPA claims, finding that the proposed action was nothing more than the continued operation of the facility. *Id.* Additionally, the court explained:

> If ... an EIS were to be required to cover continuing operations over a timespan short enough to allow realistic adjustments of operations to meet changed conditions, the Bureau and most other federal agencies would be condemned to an endless round of paperwork.... Thus, for projects ... which have an annual planning cycle, an EIS would virtually always be in progress.

*Trinity,* 438 F.Supp. at 1389. The court concluded that if NEPA required such an "operational" EIS, "the resulting interference with the intended functions of federal agencies could be so great as to render compliance 'impossible' within the meaning" of NEPA. *Id.* I agree. It makes no sense to impose upon Reclamation a requirement it can never fulfill.

Plaintiffs rely on a decision from the Eastern District of California, where the district court held that the implementation of statutorily-mandated water allocations required an EIS. *Westlands Water District v. United States,* 850 F.Supp. 1388 (E.D.Cal.1994). There, however, the alleged federal action involved implementation of a newly-legislated statutory scheme which reduced the amount of water available to irrigators by fifty percent. *Id.* at 1416. *Westlands* did not involve the implementation of a short-term annual water plan prepared under drought conditions.

■ Finally, even if plaintiffs could show a likelihood of success on the merits of their NEPA claim, they would not be entitled to an injunction. The APA authorizes the court to "set aside, rather than compel," agency actions. 5 U.S.C. § 706(2). Accordingly, the appropriate remedy would be to set aside the 2001 Plan and require Reclamation to prepare an EIS. Plaintiffs argue that, while the EIS is pending, the court should order historic amounts of water deliveries. Plaintiffs claim that no evidence shows that historic irrigation deliveries in prior dry years caused greater harm to the suckers or the salmon than in any other year. Plaintiffs fail to recognize that Project operations remain subject to the re-

quirements of the ESA and Reclamation's tribal trust obligations, which would preclude the delivery of any irrigation water if the 2001 Plan is set aside.[7] See 40 C.F.R. § 1506.1(c). Moreover, absent a concrete and final 2001 Plan, the injunction issued by the Northern District of California would remain in full force and effect. Therefore, plaintiffs cannot obtain the injunctive relief they seek under NEPA.

I am disturbed, however, that Reclamation has failed to complete an EIS analyzing the effects and proposed alternatives of a long-term plan. Reclamation represented in past proceedings that such a plan would be completed long before 2001. Yet, no plan exists. In essence, Reclamation is avoiding its duties under NEPA by relying on annual plans to which NEPA cannot realistically apply. During oral argument, government counsel represented that the long-term EIS is scheduled to be completed in February 2002. However, it awaits the completion of an updated NMFS BiOp, slated to be completed in June 2001. The court intends to monitor Reclamation's compliance with its representations. This dispute highlights the need for long-term planning to minimize the effects of future dry years.

### c. ESA Claims

Plaintiffs allege that Reclamation's implementation of the FWS and NMFS BiOps violates the ESA, because: 1) the RPAs outlined in the BiOps are not consistent with the intended purpose of the Project; 2) NMFS improperly determined that the ESA compels agency actions; 3) FWS and NMFS failed to develop an environmental baseline to determine the actual effects of the Project; 4) FWS failed to consider scientific evidence of variable lake elevations and the impact on sucker fish populations; and 5) NMFS relied on a lack of relevant information about the effects of variable flow regimes on salmon and the salmon's utilization of the Klamath River. Plaintiffs allege that these failures render the BiOps and their adoption by Reclamation arbitrary and capricious.

The ESA requires the Secretary of the Interior to promulgate regulations listing species of animals that are "threatened" or "endangered" under certain criteria and to designate their "critical habitat." 16 U.S.C. § 1533. The ESA further requires each federal agency to ensure that any agency action "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat." Id. § 1536(a)(2). If an agency determines that a proposed action could adversely affect a listed species, it must engage in formal consultation with the appropriate expert agency, such as FWS or NMFS. The consulting agency must then provide the action agency with a BiOp explaining how the proposed action will affect the species or its habitat, i.e., whether the proposed action will result in "jeopardy" or "no jeopardy." Id. § 1536(b)(3)(A).

If the consulting agency concludes that the proposed action will jeopardize the continued existence of a listed species or adversely affect critical habitat, the BiOp must outline any RPAs that will avoid those consequences. Id. Alternatively, if the BiOp concludes that the agency action will not result in jeopardy or adversely

---

7. The court is not convinced that prior years with low UKL elevations and Klamath River flow did not harm the fish and would not harm the fish under the unprecedented conditions of this water year. Coho salmon were not listed until 1997, and the suckers remain endangered more than twelve years after they were listed. As the government noted in argument, lowering UKL even one foot lower than the minimum RPA of 4139 would reduce the suckers' habitat by 50%.

affect habitat, or proposes RPAs to avoid jeopardy, the consulting agency must provide a written statement specifying the "impact of such incidental taking on the species," as well as RPAs "necessary or appropriate to minimize such impact." *Id.* § 1536(b)(4). Finally, the consulting agency must describe the terms and conditions that must be complied with to implement the RPAs. *Id.* During the consultation process, the ESA forbids "irreversible or irretrievable commitment of resources" which could foreclose the implementation of an RPA. *Id.* § 1536(d).

■ Plaintiffs first argue that the purpose of the Klamath Project, pursuant to the Reclamation Act, is irrigation. Plaintiffs allege that the RPAs adopted by Reclamation benefit fish to the detriment of irrigation, and the RPAs are therefore inconsistent with the Project's purpose. Plaintiffs also allege that the RPAs contained in the BiOps are not "economically feasible." These arguments are without merit.

True, an RPA is defined as an alternative action which is "consistent with the purposes of the action" and "economically and technically feasible." 50 C.F.R. § 402.02. Read in context, however, the RPAs must be economically and technically feasible for the government to implement. Additionally, as discussed above, agency actions taken pursuant to the Reclamation Act must comply with the requirements of the ESA. *See Tennessee Valley Authority v. Hill,* 437 U.S. 153, 185, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978) (ESA obligations take "priority over the 'primary' missions" ' of federal agencies). Further, agency actions are subject to the government's duty to protect tribal resources. Reclamation's legal duty to operate the Project consistent with its ESA and tribal trust obligations does not render the RPAs inconsistent with the Project's purpose. *Patterson,* 204 F.3d at 1213–14.

Next, plaintiffs attempt to argue that no provision of the ESA compels Reclamation to take action to release previously stored water to augment the flow of the Klamath River. The government contends that the RPAs do not require Reclamation to "manufacture" water, but that the RPAs are conditioned upon the availability of water. Defendants' Opposition to Motion for Preliminary Injunction, p. 22, n. 15. Regardless, the ESA requires an agency to avoid jeopardy to species, "whatever the cost." *TVA v. Hill,* 437 U.S. at 184, 98 S.Ct. 2279. Plaintiffs present no support for this novel interpretation of the ESA.

■ Plaintiffs also argue that FWS and NMFS failed to develop an environmental baseline for the suckers and coho salmon in the BiOps. Plaintiffs contend that an environmental baseline must be established so as to compare "some thing or some condition" to "something else or some other condition." Plaintiffs' Memorandum in Support of Preliminary Injunction, p. 29–30. Plaintiffs provide no support for this interpretation, and the regulatory definition of "environmental baseline" refutes their argument.

A BiOp prepared by FWS or NMFS must "[e]valuate the effects of the action and cumulative effects on the listed species or critical habitat." 50 C.F.R. § 402.14(g)(3). "Effects of the action" is defined as "the direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action, that will be added to the environmental baseline." *Id.* § 402.02 (definitions). The "environmental baseline" includes "past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal . . . consul-

tation, and the impact of State or private actions which are contemporaneous with the consultation in process." *Id.*

Therefore, all human activities that impact the listed species must be considered in the environmental baseline. The effects of the proposed action are then addressed "in conjunction with the impacts that constitute the baseline." *Defenders of Wildlife v. Babbitt,* 130 F.Supp.2d 121, 127–28 (D.D.C.2001) ("The [BiOp] must also include an analysis of the effects of the action on the species when 'added to' the environmental baseline—in other words, an analysis of the total impact on the species."). The environmental baseline is part of the entire "effects of the action" on the listed species or habitat that must be considered, rather than some concrete standard or condition to which other standards or conditions are compared. A cursory review of the BiOps shows that FWS and NMFS considered the cumulative impacts on sucker and salmon populations and their respective habitats.

Finally, plaintiffs argue that the RPAs are not based on the best scientific evidence available, and that other alternatives supported by scientific evidence should be employed by Reclamation to preserve water for irrigation releases.

Upon a finding of jeopardy, the ESA requires the Secretary of the Interior to "suggest those reasonable and prudent alternatives" which would not likely jeopardize the continued existence of an endangered species. 16 U.S.C. § 1536(b)(3)(A). The RPAs must be based on the "best scientific and commercial data available." 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(g)(8).

■ An agency has wide latitude to determine what is "the best scientific and commercial data available." The Ninth Circuit has interpreted this provision to mean an agency cannot ignore available biological information. "In light of the ESA requirement that the agencies use the best scientific and commercial data available to insure that protected species are not jeopardized, the USFWS cannot ignore available biological information." *Conner v. Burford,* 848 F.2d 1441, 1454 (9th Cir.1988) (internal cite omitted); *accord San Luis & Delta–Mendota Water Authority v. Badgley,* 136 F.Supp.2d 1136, 1147–48 (E.D.Cal. 2000); *Pacific Coast Federation of Fishermen's Ass'n v. National Marine Fisheries Service,* 71 F.Supp.2d 1063, 1073 (W.D.Wash.1999). Thus, it is presumed that agencies have used the best data available unless those challenging agency actions can identify relevant data not considered by the agency. *See, e.g., Friends of Endangered Species v. Jantzen,* 760 F.2d 976, 985 (9th Cir.1985).

■ Plaintiffs allege that NMFS and FWS selectively reported information in the BiOps and ignored relevant scientific evidence. *See* Declaration of David A. Vogel, ¶¶ 5, 7. For example, plaintiffs allege that the FWS BiOp fails to recognize evidence demonstrating that lower levels of UKL will not harm and may benefit the sucker fish. Apparently, plaintiff Klamath Water Users Association provided Reclamation with a report titled *"Protecting the Beneficial Uses of Waters of Upper Klamath Lake: A Plan to Accelerate Recovery of the Lost River and Shortnose Suckers."* *See* Declaration of Alex J. Horne, Ex. A. According to the report, increasing the depth of UKL in the summer, as proposed under the 2001 Plan, could promote rather than inhibit fish kills. Vogel Declaration, ¶¶ 6,7. Plaintiffs recommend the technique of oxygenation or aeration, to improve water quality and decrease the risk of fish kills. Horne Declaration, ¶ 4. Plaintiffs further contend that FWS does not establish the necessity for vegetated habitat for shortnose and Lost River suck-

er larval survival, because the BiOp did not address evidence that larvae existed at non-vegetated sites at other nearby reservoirs. Declaration of Keith Marine, ¶ 12.

With respect to the NMFS BiOp, plaintiffs contend that it fails to consider "numerous other factors" other than the flow regime at Iron Gate Dam which affect coho salmon population. Vogel Declaration, ¶ 9; Marine Declaration, ¶ 9. Plaintiffs maintain that little, if any, scientific evidence supports the conclusion that water releases from Iron Gate Dam affects the salmon. Vogel Declaration, ¶¶ 9–11. Further, plaintiffs claim that the tributaries of the Klamath River, rather than the mainstem, is the critical habitat of the coho salmon.[8] Vogel Declaration, ¶ 19. Plaintiffs also allege that the final BiOp fails to address numerous criticisms of the draft BiOp. Supplemental Declaration of David A. Vogel.

Defendants-intervenors The Wilderness Society and the Tribes present opposing views. "Plaintiffs have based their criticisms on the [FWS BiOp] on incomplete or cursory analysis of the vast body of data on UKL, incomplete review of existing literature and research, a complete misunderstanding and oversimplification of the lake elevation, water quality, and fisheries dynamics within UKL." Declaration of Dr. Jacob Kann, ¶ 2. The Klamath Tribes dispute the contention that the FWS BiOp is not supported by adequate scientific evidence concluding that vegetated habitats are important to sucker populations. Declaration of Larry Dunsmoor, ¶ 4. The Tribes also dispute plaintiffs' conclusions about fish kill data, describing plaintiffs'

expert's approach as simplistic. Dunsmoor Declaration, ¶ 12.

The Wilderness Society and the Yurok Tribe maintain that the reduced flow in the Klamath River caused by Project Operations over the last 85 years is one of the major contributing factors to the decline in salmon populations. Declaration of Ronnie M. Pierce, ¶ 17. The Wilderness Society and the Tribe criticize plaintiffs' assumption that the salmon do not need adequate flow stream in the mainstem Klamath River to avoid jeopardy. Pierce Declaration, ¶¶ 10, 17; Declaration of Michael Belchik, ¶¶ 9–17. They emphasize that some evidence plaintiffs rely on is outdated and inapplicable to the current conditions of the Klamath River and the 1997 listing of the coho salmon. Belchik Declaration, ¶¶ 14, 18; *see also,* Declaration of Michael Rode (attached as Ex. A. to Declaration of Jan Hasselman).

Finally, the government directs the court to the reasoning and conclusions of the BiOps and evidence in the record which rebuts plaintiffs' contentions. *See* Defendants' Opposition to Motion for Preliminary Injunction, pp. 26–36. The government also points out that others in the scientific community reviewed plaintiffs' contentions and found them lacking. *Id.* p. 30; *see* FWS AR, Volume 25, D–2; D–3; D–5; D–6; D–7; D–9. Moreover, plaintiffs fail to identify relevant scientific evidence that FWS or NMFS failed to consider. The relevant evidence allegedly "ignored" is included in the administrative record, as plaintiffs emphasize. *See* Supp. Declaration of David A. Vogel.

8. Plaintiffs complain that some of the evidence that FWS and NMFS relied upon was performed without public or independent scientific peer review, and that their representatives have not been included in the consultation process. *See, e.g.,* Declaration of Tessa Stuedli. However, as the government correctly pointed out during oral argument, the ESA does not require public review or input during the consultation process. *See* 50 C.F.R. § 402.14(g). Further, the government noted that it voluntarily made draft and final BiOps and EAs available to plaintiffs and others through a Web site and other sources.

The opposing views and supporting evidence of the parties demonstrate that plaintiffs simply disagree with the scientific conclusions reached by FWS and NMFS. *See* Plaintiffs' Reply in Support of Motion for Preliminary Injunction, pp. 15–20. The fact that such disagreement exists, however, does not render the BiOps arbitrary and capricious. *See Aluminum Co. v. Bonneville Power Admin.,* 175 F.3d 1156, 1162 (9th Cir.1999), *cert. denied,* 528 U.S. 1138, 120 S.Ct. 983, 145 L.Ed.2d 933 (2000) (NMFS' BiOp was not arbitrary and capricious where differing scientific views were resolved through expert choices and plans for further studies). An agency is not required to rely on evidence that is conclusive or certain; rather, an agency must utilize the best evidence available when preparing BiOps. *Greenpeace Action v. Franklin,* 14 F.3d 1324, 1336–37 (9th Cir.1992) ("upholding finding of no jeopardy based on admittedly 'weak' evidence"); *accord Defenders of Wildlife v. Babbitt,* 958 F.Supp. 670, 680 (D.D.C.1997).

The FWS and NMFS BiOps explain how the RPA minimum UKL levels and Klamath River flows are necessary to avoid jeopardy to suckers and coho salmon and to preserve their habitat. The BiOps are supported by voluminous administrative records, rendering it unlikely that they have no rational basis.

Plaintiffs would have the court substitute plaintiffs' analysis of the relevant science for that of the expert agencies. However, the court cannot force Reclamation to choose one alternative over another. *See Southwest Center for Biological Diversity v. United States Bureau of Reclamation,* 143 F.3d 515, 523 (9th Cir.1998) (the Secretary is not required to choose the best alternative or to explain why one alternative was chosen over another). Absent a showing that NMFS or FWS failed to consider relevant, available, scientific data, plaintiffs are unlikely to prevail on this claim.

Regardless, even if plaintiffs could show a likelihood of success on the merits of their ESA claims, they would not be entitled to the injunctive relief they seek. Under the APA, the court has authority to "set aside" the challenged agency action, i.e., the BiOps.[9] Reclamation has recognized that ongoing operations of the Project could adversely affect suckers and coho salmon and initiated consultation with NMFS and FWS. Therefore, if the BiOps are set aside, Reclamation must reinitiate consultation and obtain valid BiOps from NMFS and FWS. During that time, ESA prohibits an agency from committing resources which would preclude the application of an RPA:

> After initiation of consultation required under subsection (a)(2) of this section, the Federal agency ... shall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate subsection (a)(2) of this section.

16 U.S.C. § 1536(d); 50 C.F.R. § 402.09. Here, release of the requested amounts of Project irrigation water would foreclose the implementation of any RPA involving higher UKL elevations and higher instream flows below Iron Gate Dam; the water would be irretrievable. Moreover, if the BiOps were set aside, the require-

---

9. The government also argues that plaintiffs are not entitled to injunctive relief because APA does not provide for affirmative injunctive relief and that relief pursuant to the citizen suit provision of ESA requires sixty days notice. 16 U.S.C. § 1540(g)(2)(A)(i). The court finds the sixty-day notice requirement inapplicable here, where plaintiffs seek judicial review of their claim pursuant to the APA.

ments set forth by Judge Armstrong in *Pacific Coast Federation of Fishermen's Associations v. Bureau of Reclamation* would not be met, and in all likelihood the injunction enjoining releases of irrigation water, if lifted, would be reinstated. Therefore, even if plaintiffs could show a likelihood of success on the merits of their ESA claims, the ESA explicitly prohibits the relief they seek.

### CONCLUSION

In essence, plaintiffs request that this court stand in the place of Reclamation as the operator of the Project and reallocate Project water in a manner that is inconsistent with governing law. Plaintiffs fail to show a likelihood of success on the merits of their claims, and, more importantly, plaintiffs fail to establish that they are entitled to the injunctive relief they seek. While the court sympathizes with plaintiffs and their plight, I am bound by oath to uphold the law. The law requires the protection of suckers and salmon as endangered and threatened species and as tribal trust resources, even if plaintiffs disagree with the manner in which the fish are protected or believe that they inequitably bear the burden of such protection.

The scarcity of water in the Klamath River Basin is a situation likely to reoccur. It is also a situation which demands effort and resolve on the part of all parties to create solutions that provide water for the necessary protection of fish, wildlife and tribal trust resources, as well as the agricultural needs of farmers and their communities. Continued litigation is not likely to assist in such a challenging endeavor. This court hopes and expects that the parties and other entities necessary to long-term solutions will continue to pursue alternatives to meet the needs of the Klamath River Basin.

Plaintiffs' Motion for Preliminary Injunction (doc. # 3) is DENIED.

IT IS SO ORDERED.